UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION


FILED
SEP 0 4 2015
CLERK

| | |
|---|---|
| AMERICAN DAIRY QUEEN CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>AMY WARDLOW, AND GREGORY WARDLOW,<br><br>Defendants. | 4:15-CV-04131-RAL<br><br>OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |

Defendants Amy and Gregory Wardlow have continued to operate a Dairy Queen® restaurant using the Dairy Queen® trademarks despite Plaintiff American Dairy Queen Corporation ("ADQ") having terminated Defendants' right to do so. Doc. 10 at 2–3. ADQ moved for a preliminary injunction, claiming that the Defendants' actions were causing it irreparable harm. For the reasons explained below, this Court grants ADQ's motion for a preliminary injunction.

I. Facts

ADQ is the owner of the federally registered Dairy Queen® trademark and other trademarks and service marks used in connection with the operation of a Dairy Queen® restaurant. Doc. 10-1. ADQ is the franchisor in the Dairy Queen® franchise system. Doc. 10 at 1. As such, ADQ licenses to others the right to display ADQ's Marks and operate its restaurants as part of the Dairy Queen® franchise system. The Dairy Queen® Marks have been

1

used in connection with the sale of soft serve, frozen, and semi-frozen dairy products, frozen and semi-frozen products, cooked food products, and other products and services throughout the United States. Doc. 10 at 1. ADQ and its related companies have invested millions of dollars in the advertisement and promotion of goods and services sold under the Dairy Queen® Marks. Doc. 10 at 1.

Effective May 14, 2001, the Wardlows accepted assignment of a Dairy Queen® Operating Agreement dated November 9, 1995 ("Operating Agreement"). Doc. 10 at 2; Doc. 10-2. Defendants' Operating Agreement granted them the license and right to display the Dairy Queen® Marks at their restaurant and identify that restaurant as part of the Dairy Queen® franchise system. The agreement made clear, however, that the Dairy Queen® Marks belong solely to ADQ and that Defendants had received only a limited license to display those Marks. Pursuant to Article 3(A) of the Operating Agreement, Defendants agreed that ADQ is the exclusive owner of the Marks.[1] Doc. 10-2 at 5–6. Defendants further agreed that they had the right to display the Marks only in a manner approved by ADQ.

In return for the right to display ADQ's Marks and participate in the Dairy Queen® franchise system, the Wardlows agreed to pay certain fees to ADQ. Specifically, Article 9 of the Operating Agreement required Defendants to pay ADQ a monthly license fee equal to 4% of their monthly gross sales, as well as a separate sales promotion fee. Doc. 10-2 at 16. Those fees, along with required monthly reports showing Defendants' gross sales, were due to ADQ by the tenth day of each month for the previous month's sales. Doc. 10 at 16–19. The Operating Agreement made clear that failure to submit those reports or pay the amounts owed on a timely

---

[1] The Operating Agreement was originally signed by Minnehaha Dairy Queen, Inc., who served as ADQ's territory operator in the state of South Dakota under a separate territory agreement with ADQ. Minnehaha Dairy Queen, Inc. assigned its interest in the Operating Agreement to ADQ in October 2006, pursuant to Article 11(G) of the Operating Agreement. Doc. 10 at 1–2.

2

basis would constitute a breach of the Operating Agreement that could lead to its termination. Doc. 10-2 at 28–29. Under Article 12 of the Operating Agreement, ADQ could terminate Defendants' franchise rights if Defendants failed to cure their defaults within seven days of receiving written notice from ADQ. Doc. 10-2 at 29–30.

Defendants breached the Operating Agreement by failing to submit required sales reports and accompanying fees to ADQ. Doc. 10 at 2. Specifically, Defendants failed to submit the fees owed for the month of August 2014 as well as the fees and reports owed for October 2014 through July 2015. Doc. 10 at 2. On January 22, 2015, ADQ issued a formal Notice of Default, advising Defendants that their franchise rights would be terminated if they failed to timely cure their default by submitting the required reports and fees. Doc. 10 at 2; Doc. 10-3 at 2. Defendants failed to cure their default within the time provided by ADQ's letter. Doc. 10 at 2. ADQ thus had the right to terminate the Wardlows' franchise rights, as provided by Article 12 of the Operating Agreement. ADQ issued a Confirmation of Termination dated March 26, 2015, with a termination effective date of May 25, 2015. Doc. 10-4.

After a period of negotiation, Defendants agreed to sign a Mutual Cancellation and Release Agreement that would give them an opportunity to sell their restaurant to another Dairy Queen® franchisee. Doc. 10 at 3. Rather than face the immediate termination of their franchise rights, the Mutual Cancellation and Release agreement would give Defendants until December 1, 2015, to transfer their restaurant. Doc. 10-5. Defendants executed that Agreement on May 28, 2015. Doc. 10-5. In exchange for ADQ's forbearance from exercising its right to terminate immediately their franchise rights, the Wardlows agreed that going forward they would comply with the Operating Agreement as they attempted to sell their restaurant. Doc. 10 at 3. Article 2(d) of the Mutual Cancellation provides that:

3

> Licensee represents and warrants that they will pay, during the term of this Cancellation, any and all amounts owed by Licensee to ADQ, its affiliates, or suppliers to whom ADQ or any of its affiliates has any contingent liability. Furthermore, Licensee will submit when due all SMRs and accompanying fees during the term of this Cancellation. Failure to comply with the requirements set forth in this paragraph may, in ADQ's sole discretion, result in either ADQ's acceleration of the Termination Date or the requirement that the Restaurant be closed until all SMRs and fees are current.

Doc. 10-5 at 3. Through Article 3, the Wardlows agreed that their failure to comply with any of the terms of the Mutual Cancellation would give ADQ the right to terminate their franchise rights prior to December 1, 2015. Doc. 10-5 at 3.

The Wardlows agreed under the Mutual Cancellation that upon termination of their franchise rights, they would take all steps necessary to de-identify their restaurant from the Dairy Queen® system. Doc. 10-5 at 3. Among other things, Defendants agreed to "remove all trademarks, signs, insignia, proprietary products and ingredients." Doc. 10-5 at 3.

The Wardlows breached the Mutual Cancellation by failing to submit all required monthly reports and fees to ADQ. Doc. 10 at 3. While the Wardlows eventually submitted required reports for August and September 2014 (and fees for September 2014), they refused to do so for any subsequent month. As of today, the Wardlows have failed to submit required reports and fees for ten consecutive months. Doc. 10 at 3. By letter dated July 15, 2015, ADQ advised the Wardlows that their failure to submit required reports and fees through June 2015 constituted a breach of the Mutual Cancellation agreement. Doc. 10 at 3; Doc. 10-6. That letter informed the Wardlows that they must immediately close their Dairy Queen® restaurant. Doc. 10-6. While ADQ remained willing to give the Wardlows until December 1, 2015, to find a buyer, ADQ was unwilling to permit the Wardlows to continue operating the restaurant without paying fees to ADQ. Doc. 10-6.

The Wardlows ignored ADQ's demand and continued operating their restaurant. Doc. 10 at 3. By letter dated July 27, 2015, ADQ's counsel advised the Wardlows that ADQ would give them 48 hours to either (a) submit all outstanding reports and fees or (b) close the restaurant. Doc. 10-7. That letter warned Defendants that failure to comply would lead ADQ to terminate the Mutual Cancellation agreement and commence legal action against them. Doc. 10-7. Again, Defendants ignored ADQ's warning and continued operating their restaurant. Doc. 10 at 3.

By letter dated July 31, 2015, ADQ's counsel advised Defendants that ADQ was exercising its right to terminate the Mutual Cancellation and the Operating Agreement due to Defendants' repeated failure to comply with their contractual obligations. Doc. 10-8. That letter repeated ADQ's previous demand that the Wardlows immediately close the restaurant and advised them that they no longer had an opportunity to sell the restaurant as a Dairy Queen® franchise. Doc. 10-8. ADQ's counsel closed the July 31 letter with another warning that failure to close the restaurant immediately would leave ADQ no choice but to commence legal action to enforce its trademark rights. Doc. 10-8.

Defendants have ignored ADQ's repeated demands that they cease operating their restaurant under ADQ's trademarks. Defendants continue to operate the restaurant as though it were still a properly licensed Dairy Queen® restaurant. Visits by a representative of ADQ to the restaurant on August 4, 2015, and August 6, 2015, confirmed that Defendants continue to display ADQ's trademarks at the restaurant, including on signage and menu boards. Doc. 11. Defendants also continue to serve products to the public that are identified as authentic Dairy Queen® products. Doc. 11.

On August 4, 2015, ADQ filed a Complaint against Defendants asserting claims for trademark infringement, false designation of origin, breach of contract, and unjust enrichment.

Doc. 1. ADQ served Defendants with a summons and the Complaint that same day. Docs. 4, 6. On August 13, 2015, ADQ moved for a preliminary injunction seeking to enjoin Defendants from using or displaying the Dairy Queen® trademarks or any other marks similar to the Dairy Queen® trademarks; selling or distributing any Dairy Queen® products; and operating their restaurant at 230 South Splitrock Boulevard, Brandon, South Dakota until all Dairy Queen® trademarks had been removed from the restaurant premises. Doc. 8. ADQ served Defendants with its motion for a preliminary injunction and the accompanying documents on August 15, 2015. Doc. 14.

This Court set a hearing for 10:00 a.m. on September 3, 2015, to address ADQ's motion for a preliminary injunction. Although the Clerk of Courts Office sent Defendants a letter notifying them of the date and time of this hearing, only ADQ attended. Counsel for ADQ informed this Court that while speaking with Gregory Wardlow on the telephone on September 2, 2015, she had told him that the hearing was scheduled for 11:00 a.m. the following day. Upon realizing her mistake, Counsel for ADQ called Gregory Wardlow back and left him a message explaining that the hearing would actually occur at 10:00 a.m. When Defendants had yet to arrive at a quarter past ten, this Court recessed with the understanding that the parties would reconvene at 11:00 a.m. if Defendants appeared. Defendants failed to do so.

## II. Analysis

In determining whether to grant a preliminary injunction, this Court considers the factors set forth in Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc): "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 113; see

also Perfetti Van Melle USA, Inc., v. Midwest Processing, LLC, No. 4:15-CV-04093-RAL, 2015 WL 3544847, at *4–6 (D.S.D. June 4, 2015) (applying Dataphase factors when considering request for preliminary injunction); Germalic v. Gant, No. CIV 12-3030-RAL, 2012 WL 5334737, at *2–3 (D.S.D. Oct. 26, 2012) (same).

Under the Dataphase factors, ADQ is entitled to preliminary injunctive relief. The first Dataphase factor concerns the threat of irreparable harm to ADQ. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). A company's loss of goodwill and reputation among its customers is often not quantifiable, and can therefore amount to irreparable harm. Rogers Grp., Inc. v. City of Fayetteville, Ark., 629 F.3d 784, 789–90 (8th Cir. 2010) ("We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm."); Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."). Here, Defendants are displaying ADQ trademarks at their restaurant and serving food labeled as official Dairy Queen® product despite no longer having a franchise agreement with ADQ. Without a franchise agreement, ADQ lacks the ability to ensure that Defendants are selling authentic Dairy Queen® products, preparing the products appropriately, and meeting ADQ's standards for cleanliness and sanitation. If customers at Defendants' restaurant have an unsatisfactory experience, they may attribute this experience to the entire Dairy Queen® franchise system and decline to visit authentic Dairy Queen®

restaurants in the future. The potential for such customer confusion is particularly high in this case, where Defendants are operating their restaurant at the same location that they previously operated a properly licensed Dairy Queen®. The harm that ADQ will suffer if customers have a negative experience at Defendants' restaurant and attribute this experience to the Dairy Queen® brand in general is not readily quantifiable, if at all. Accordingly, ADQ will suffer irreparable harm if Defendants are allowed to continue to use ADQ's trademarks. The first <u>Dataphase</u> factor therefore militates in favor of granting the preliminary injunction.

The next <u>Dataphase</u> factor is the balance between the harm to ADQ and the injury that granting the injunction will inflict on Defendants. To be sure, Defendants will suffer some harm should the preliminary injunction enter; they will need to rebrand their restaurant and will likely lose profits as a result of no longer being able to use ADQ's marks. Yet these harms are the natural consequence of Defendants' actions. The Operating Agreement made clear that Defendants' right to use ADQ's marks was conditioned on, among other things, on Defendants' payment of monthly license fees. By failing to pay these fees, Defendants breached the Operating Agreement and gave ADQ the option of termination. Although Defendants were given the opportunity to cure their breach, they declined to do so. Under these circumstances, the balance of the harms tilts in ADQ's favor. See <u>Pappan Enters., Inc. V. Hardee's Food Systems, Inc.</u>, 143 F.3d 800, 806 (3d Cir. 1998) ("[A] party's self-inflicted harm by choosing to stop its own performance under the contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchisor of the mark."); <u>Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 612 (1st Cir. 1988) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'"

8

(quoting Helene Curtis Indus. V. Church & Dwight Co., Inc., 560 F.2d 1325, 1333 (7th Cir. 1997))); Jiffy Lube Int'l, Inc. v. Weiss Bros., 834 F. Supp. 683, 693 (D.N.J. 1993) (explaining that where the defendants had breached a franchise agreement by failing to pay monthly royalty fees, the harm defendants would suffer as a result of being enjoined from using the plaintiffs' trademarks was "not the type of harm from which we seek to protect a defendant").

The third Dataphase factor focuses on the probability that the movant will succeed on the merits. Probability of success on the merits in this context means that the moving party must show that it has "a 'fair chance of prevailing'" on the merits. Kroupa v. Nielsen, 731 F.3d 813, 818 (8th Cir. 2013) (quoting Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). A "fair chance of prevailing" does not necessarily mean a greater than fifty percent likelihood of prevailing on the merits of the claim. Planned Parenthood, 530 F.3d at 731–32.

Based on the material of record, ADQ has a fair chance to prevail on Count III of its Complaint. ADQ alleges in Count III that Defendants breached the Mutual Cancellation and Release contract by failing to submit their monthly statements and license fees and failing to fulfil their post-termination obligation to remove all ADQ trademarks, signs, and products from their restaurant. The elements of a breach of contract claim under South Dakota law are "(1) an enforceable promise; (2) a breach of that promise; and, (3) resulting damages." Bowes Constr., Inc. v. S.D. Dep't of Transp., 793 N.W.2d 36, 43 (S.D. 2010). Here, a signed copy of the Mutual Cancellation and Release contract filed with this Court establishes that in exchange for the opportunity to sell their restaurant, the Defendants did, in fact, promise to submit their monthly statements and licensing fees and de-identify their restaurant from Dairy Queen® once their franchise rights ended. Doc. 10-5 at 3. Further, a declaration and affidavit filed by ADQ

demonstrate that Defendants have failed to fulfill these promises. Docs. 10, 11. In this Court's view, ADQ has shown a sufficient likelihood of success on its claim that Defendants breached the Mutual Cancellation and Release contract.

The fourth Dataphase factor—the public interest—also favors granting the preliminary injunction. The public has an interest in being able to rely on a franchisor's marks when choosing whether to buy particular products. See 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.4 (3d ed. 2013). The public interest disfavors those who act beyond their contractual rights and hold themselves out as something they are not.

The only remaining issue is bond. Rule 65 of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of the bond rests within the sound discretion of the trial court . . . ." Stockslager v. Carroll Elec. Coop. Corp., 528 F.2d 949, 951 (8th Cir. 1976). One court has concluded that under the mandatory language of Rule 65(c), "requiring a bond in some amount before issuing a preliminary injunction is far the better course." Sak v. City of Aurelia, Iowa, 832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011) (citation and internal quotation marks omitted) (requiring a bond of $1.00 where the potential for damage was "extremely limited"). There is little practical difference between a one dollar bond and no bond. Given that Defendants appear to have no right to continue displaying ADQ marks while refusing to pay any licensing fees, there is little risk that entering an injunction against Defendants will cause them legitimate monetary damage. Thus, ADQ need not submit security in this case, although this Court will consider a motion and argument to the contrary if and when Defendants hire counsel or wish to argue for such a bond.

### III. Conclusion

For the reasons stated above, it is hereby

ORDERED that ADQ's Motion for Preliminary Injunction, Doc. 8, is granted and that Defendants Gregory and Amy Wardlow, and all those acting in concert or participation with them (including officers, managers, guarantors, and employees) are enjoined until further order from this Court from:

1. Using or displaying the Dairy Queen® trademarks or any other marks similar to the Dairy Queen® trademarks. Defendants must immediately remove all of ADQ's trademarks, signs, insignia, proprietary products, and ingredients, and all other materials associated with the Dairy Queen® franchise system, from their restaurant located at 230 South Splitrock Boulevard, Brandon, South Dakota;

2. Selling or distributing Dairy Queen® products; and

3. Operating their restaurant at 230 South Splitrock Boulevard, Brandon, South Dakota until all items described in Paragraph 1 have been removed from the restaurant. It is further

ORDERED that the Clerk of Court send to Defendants a copy of this Opinion and Order Granting Preliminary Injunction by regular mail at both the Defendants' home address and the business address. It is finally

ORDERED that this Court will hold a hearing on contempt of court sanctions if Defendants fail to comply forthwith with this Order.

DATED this 4th day of September, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE