UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

**MAR 0 1 2016**



CLERK

| AMERICAN DAIRY QUEEN CORPORATION, | 4:15-CV-04131-RAL |
|---|---|
| Plaintiff, | |
| | OPINION AND ORDER GRANTING REQUEST FOR DAMAGES |
| vs. | |
| AMY WARDLOW AND GREGORY WARDLOW, | |
| Defendants. | |

Plaintiff American Dairy Queen Corporation ("ADQ") sued Defendants Amy and Gregory Wardlow for operating a Dairy Queen® restaurant and using the Dairy Queen® trademarks despite ADQ having terminated Defendants' right to do so. Doc. 1. This Court entered a default judgment against Defendants under Federal Rule of Civil Procedure 55(b)(2), Doc. 35, and held a hearing on the issue of ADQ's recoverable damages, Doc. 40. For the reasons explained below, this Court grants ADQ's request for damages.

**I.    Facts**

ADQ is the owner of the federally registered Dairy Queen® trademark and other trademarks and service marks used in connection with the operation of a Dairy Queen® restaurant. Doc. 1 at ¶¶ 9–10; Doc. 10-1. ADQ is the franchisor in the Dairy Queen® franchise system. Doc. 10 at 1. As such, ADQ licenses to others the right to display ADQ's Marks and operate its restaurants as part of the Dairy Queen® franchise system. The Dairy Queen® Marks

1

have been used in connection with the sale of soft serve, frozen, and semi-frozen dairy products, frozen and semi-frozen products, cooked food products, and other products and services throughout the United States. Doc. 1 at ¶ 10; Doc. 10 at 1. ADQ and its related companies have invested millions of dollars in the advertisement and promotion of goods and services sold under the Dairy Queen® Marks. Doc. 1 at ¶ 12; Doc. 10 at 1.

Effective May 14, 2001, Defendants accepted assignment of a Dairy Queen® Operating Agreement dated November 9, 1995 ("Operating Agreement"). Doc. 1 at ¶¶ 13–15; Doc. 10 at 2; Doc. 10-2. Defendants' Operating Agreement granted them the license and right to display the Dairy Queen® Marks at their restaurant and identify that restaurant as part of the Dairy Queen® franchise system. Doc. 1 at ¶¶ 13, 17. The agreement made clear, however, that the Dairy Queen® Marks belong solely to ADQ and that Defendants had received only a limited license to display those Marks. Under Article 3(A) of the Operating Agreement, Defendants agreed that ADQ is the exclusive owner of the Marks.[1] Doc. 10-2 at 5–6. Defendants further agreed that they had the right to display the Marks only in a manner approved by ADQ. Doc. 10-2 at 6.

In return for the right to display ADQ's Marks and participate in the Dairy Queen® franchise system, Defendants agreed to pay certain fees to ADQ. Doc. 1 at ¶¶ 17–20. Specifically, Article 9 of the Operating Agreement required Defendants to pay ADQ a monthly license fee equal to 4% of their monthly gross sales, as well as a separate sales promotion fee in an amount determined by ADQ. Doc. 1 at ¶¶ 18–19; Doc. 10-2 at 16. Those fees, along with required monthly reports showing Defendants' gross sales, were due to ADQ by the tenth day of

---

[1]The Operating Agreement was originally signed by Minnehaha Dairy Queen, Inc., who served as ADQ's territory operator in the state of South Dakota under a separate territory agreement with ADQ. Minnehaha Dairy Queen, Inc. assigned its interest in the Operating Agreement to ADQ in October 2006, pursuant to Article 11(G) of the Operating Agreement. Doc. 10 at 1–2.

each month for the previous month's sales. Doc. 1 at ¶¶ 17, 20; Doc. 10 at 16–19. The Operating Agreement made clear that failure to submit those reports or pay the amounts owed on a timely basis would constitute a breach of the Operating Agreement that could lead to its termination. Doc. 10-2 at 28–29. Under Article 12 of the Operating Agreement, ADQ could terminate Defendants' franchise rights if Defendants failed to cure their defaults within seven days of receiving written notice from ADQ. Doc. 10-2 at 29–30.

Defendants breached the Operating Agreement by failing to submit the required sales reports and accompanying licensing and sales promotion fees to ADQ. Doc. 1 at ¶ 21; Doc. 10 at 2. Specifically, Defendants did not submit the fees owed for the month of August 2014, as well as the fees and reports owed for October 2014 through July 2015. Doc. 1 at ¶ 21; Doc. 10 at 2. On January 22, 2015, ADQ issued a formal Notice of Default, advising Defendants that their franchise rights would be terminated if they failed to timely cure their default by submitting the required reports and fees. Doc. 1 at ¶ 22; Doc. 10 at 2; Doc. 10-3 at 2. Defendants failed to cure their default within the time provided by ADQ's letter. Doc. 1 at ¶ 23; Doc. 10 at 2. ADQ thus had the right to terminate the Defendants' franchise rights, as provided by Article 12 of the Operating Agreement. Doc. 1 at ¶ 24; Doc. 28 at 29–31. ADQ issued a Confirmation of Termination dated March 26, 2015, with a termination effective date of May 25, 2015. Doc. 1 at ¶ 23; Doc. 10-4.

After a period of negotiation, Defendants agreed to sign a Mutual Cancellation and Release Agreement ("Mutual Cancelation") that avoided immediate termination by giving them until December 1, 2015, to sell their restaurant to another Dairy Queen® franchisee. Doc. 1 at ¶¶ 24–25; Doc. 10 at 3; Doc. 10-5. Defendants executed that Agreement on May 28, 2015. Doc. 1 at ¶ 24; Doc. 10-5. In exchange for ADQ's forbearance from exercising its right to terminate

3

immediately their franchise rights, Defendants agreed that going forward they would comply with the Operating Agreement as they attempted to sell their restaurant. Doc. 10 at 3. Article 2(d) of the Mutual Cancellation provides that:

> Licensee represents and warrants that they will pay, during the term of this Cancellation, any and all amounts owed by Licensee to ADQ, its affiliates, or suppliers to whom ADQ or any of its affiliates has any contingent liability. Furthermore, Licensee will submit when due all SMRs and accompanying fees during the term of this Cancellation. Failure to comply with the requirements set forth in this paragraph may, in ADQ's sole discretion, result in either ADQ's acceleration of the Termination Date or the requirement that the Restaurant be closed until all SMRs and fees are current.

Doc. 10-5 at 3. Through Article 3, Defendants agreed that their failure to comply with any of the terms of the Mutual Cancellation would give ADQ the right to terminate their franchise rights prior to December 1, 2015. Doc. 1 at ¶ 27; Doc. 10-5 at 3. Defendants agreed under the Mutual Cancellation that upon termination of their franchise rights, they would take all steps necessary to de-identify their restaurant from the Dairy Queen® system. Doc. 1 at ¶ 28; Doc. 10-5 at 3. Among other things, Defendants agreed to "remove all trademarks, signs, insignia, proprietary products and ingredients." Doc. 10-5 at 3.

Defendants breached the Mutual Cancellation by failing to submit all required monthly reports and fees to ADQ. Doc. 1 at ¶¶ 32–33, 65; Doc. 10 at 3. Although Defendants eventually submitted required reports for August and September 2014 (and fees for September 2014), they refused to do so for any subsequent month. Doc. 10 at 2–3. By letter dated July 15, 2015, ADQ advised Defendants that their failure to submit the required reports and fees through June 2015 constituted a breach of the Mutual Cancellation agreement. Doc. 1 at ¶ 32; Doc. 10 at 3; Doc. 10-6. That letter informed Defendants that they must immediately close their Dairy Queen® restaurant. Doc. 10-6. While ADQ remained willing to give Defendants until December 1,

4

2015, to find a buyer, ADQ was unwilling to permit Defendants to continue operating the restaurant without paying fees to ADQ. Doc. 1 at ¶ 32; Doc. 10-6.

Defendants ignored ADQ's demand and continued operating their restaurant. Doc. 1 at ¶ 32; Doc. 10 at 3. By letter dated July 27, 2015, ADQ's counsel advised Defendants that ADQ would give them 48 hours to either (a) submit all outstanding reports and fees or (b) close the restaurant. Doc. 1 at ¶ 33; Doc. 10-7. That letter warned Defendants that failure to comply would lead ADQ to terminate the Mutual Cancellation agreement and commence legal action against them. Doc. 10-7. Again, Defendants ignored ADQ's warning and continued operating their restaurant. Doc. 1 at ¶¶ 34–35; Doc. 10 at 3.

By letter dated July 31, 2015, ADQ's counsel advised Defendants that ADQ was exercising its right under the Mutual Cancellation and the Operating Agreement to terminate Defendants' franchise rights due to Defendants' repeated failure to comply with their contractual obligations. Doc. 1 at ¶ 38; Doc. 10-8. That letter repeated ADQ's previous demand that Defendants immediately close the restaurant and advised them that they no longer had any right to sell the restaurant as a Dairy Queen® franchise. Doc. 10-8. ADQ's counsel closed the July 31 letter with another warning that failure to close the restaurant immediately would result in ADQ commencing legal action to enforce its trademark rights. Doc. 10-8.

As with ADQ's prior demands that Defendants cease operating their restaurant under ADQ's trademarks, the July 31 letter went unheeded. Doc. 1 at ¶ 39. Defendants continued to operate the restaurant as though it were still a properly licensed Dairy Queen® restaurant. Doc. 1 at ¶ 39. Visits by a representative of ADQ to the restaurant on August 4, 2015, and August 6, 2015, confirmed that Defendants continued to display ADQ's trademarks at the restaurant, including on signage and menu boards. Doc. 11. Defendants also continued to serve products to

5

the public that were identified as authentic Dairy Queen® products. Doc. 11.

On August 4, 2015, ADQ filed a complaint against Defendants asserting claims for trademark infringement, false designation of origin, breach of contract, and unjust enrichment. Doc. 1. ADQ served Defendants with a summons and the complaint that same day. Docs. 4, 5. In mid-August of 2015, ADQ moved for a preliminary injunction seeking to enjoin Defendants from using the Dairy Queen® trademarks and selling Dairy Queen® products. Doc. 8. ADQ served Defendants with its motion for preliminary injunction and the accompanying documents. Doc. 14.

Defendants did not answer the complaint, so ADQ moved for an entry of default judgment on September 2, 2015, which the Clerk of Court granted the next day. Doc. 25. This Court held a hearing on September 3, 2015, to address ADQ's motion for a preliminary injunction. Although the Clerk of Court's Office sent Defendants a letter notifying them of the date and time of this hearing, only ADQ attended. On September 4, 2015, this Court entered a preliminary injunction enjoining the Defendants from using or displaying the Dairy Queen® trademarks or any other marks similar to the Dairy Queen® trademarks; selling or distributing any Dairy Queen® products; and operating their restaurant until all Dairy Queen® trademarks had been removed from the restaurant premises. Doc. 27.

Thereafter, ADQ moved for default judgment under Rule 55(b)(2), seeking damages and a permanent injunction. Docs. 29, 30. As to damages, ADQ sought the unpaid license and sales promotion fees Defendants owed under the Operating Agreement, the license and sales promotion fees Defendants would have paid in August 2015 had they been using ADQ's trademarks legitimately, and attorney's fees and costs. ADQ submitted an affidavit from Connie Pheifer, a senior credit manager for ADQ, providing a calculation of its damages. Doc. 31.

6

Pheifer explained that each month while the Operating Agreement was in effect, Defendants were required to pay 4% of their gross monthly sales as a licensing fee and 4% of their gross monthly sales as a sales promotion fee. Doc. 31 at ¶¶ 3–4, 6. Because Defendants failed to report their gross monthly sales for October 2014 through July 2015, Pheifer estimated the fees for these months by using the gross monthly sales reported by Defendants for the same months in the prior year. Doc. 31 at ¶¶ 5–6. To ensure that her estimations were as accurate as possible, Pheifer also considered the amount of soft serve ice cream mix Defendants ordered for the months of October 2014 through July 2015; if Defendants ordered less ice cream mix during these months than they did during the corresponding month of the previous year, Pheifer reduced her estimation accordingly. Doc. 31 at ¶¶ 5–6. Defendants had submitted a report calculating the fees they owed for August 2014, so Pheifer did not have to perform an estimation for that month. Doc. 31 at ¶ 7; Doc. 31-11. All told, Pheifer calculated that Defendants owed $41,714.60 in license and sales promotion fees. Doc. 31 at ¶ 8. As for the money Defendants should have paid for using ADQ's trademarks in August 2015, Pheifer used Defendants' gross sales in August 2014 to determine that Defendants owed $5,421.16. Doc. 31 at ¶ 10. In support of Pheifer's affidavit, ADQ submitted Defendants' monthly sales reports for October 2013 through August 2014. Docs. 31-1–31-11.

Despite being served with the motion for default and the accompanying brief and affidavits, Defendants again failed to respond. This Court issued an order on October 23, 2015, granting ADQ's motion for default judgment under Rule 55(b)(2) and requiring that the parties cooperate to set a hearing on ADQ's damages. Doc. 35. Defendants received notice of the October 23 order as well as a later order scheduling the damages hearing. The damages hearing took place as planned on November 24, 2015, but only ADQ attended. Pheifer testified at the

hearing that in her experience, the amount of soft serve ice cream mix a store ordered was a "great" indicator of the store's sales. She also explained that she had lowered her estimate of the amount Defendants should have paid in August 2015 after receiving the soft serve mix data for that month. Pheifer now estimated that Defendants should have paid only $2,560 to ADQ in August 2015.

## II.    Analysis

After a default judgment, the factual allegations of the complaint are taken as true, except those concerning damages. Murray v. Lene, 595 F.3d 868, 871 (8th Cir. 2010). A party who wins a default judgment is still "required to prove the amount of damages that should be awarded." Oberstar v. FDIC, 987 F.2d 494, 505 n.9 (8th Cir. 1993). When, as here, the defendant's complete failure to participate in the case hinders the calculation of damages, the plaintiff is entitled to all reasonable inferences, Pleitez v. Carney, 594 F. Supp. 2d 47, 48–49 (D.D.C. 2009), and need not prove its damages with absolute certainty, see Domanus v. Lewicki, 742 F.3d 290, 303 (7th Cir. 2014) ("[O]ur decisions allow broad latitude in quantifying damages, especially when the defendant's own conduct impedes quantification—even speculation has its place in estimating damages." (quotation and internal marks omitted))).

### A. Contractual Damages

ADQ seeks to recover $41,714.60 in contractual damages under Count III of its complaint, which alleges that Defendants breached the Mutual Cancellation by failing to pay the licensing and sales promotion fees. Doc. 1. Although ADQ already has obtained a default judgment, this Court affirms here that the facts support recovery for breach of contract. Under the Mutual Cancellation, ADQ gave Defendants an opportunity to sell their restaurant in exchange for Defendants' promise to pay not only their past due fees, but also those fees that

8

Defendants would owe for operating their restaurant after May 28, 2015. Doc. 1 at ¶ 63; Doc. 10-5. Defendants breached the Mutual Cancellation by failing to pay the fees they owed and this breach caused ADQ damage. Doc. 1 at ¶¶ 65–66. These facts meet the elements for a breach of contract. See Bowes Constr., Inc. v. S.D. Dep't of Transp., 793 N.W.2d 36, 43 (S.D. 2010) (explaining that the elements of a breach of contract claim are "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages.").

In South Dakota, the victor in a contract action may recover the damages caused by the defendant's breach. Bunkers v. Jacobson, 653 N.W.2d 732, 743 (S.D. 2002). Here, ADQ has proven to a reasonable degree of certainty that it suffered $41,714.60 in damages due to Defendants' failure to pay their licensing and sales promotion fees in August 2014 and from October 2014 through July 2015. Defendants' failure to submit monthly reports and refusal to participate in this case made it impossible to calculate the exact amount Defendants owed for October 2014 through July 2015. Under these circumstances, ADQ's method for calculating the amount of fees Defendants owe for October 2014 through July 2015 was fair and rational. Courts have approved of the use of past sales records to calculate unpaid royalties. Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC, 423 F. App'x 274, 285–86 (4th Cir. 2011); Days Inns Worldwide, Inc. v. Inv. Props. of Brooklyn Ctr., LLC, No. 10-609 (MJD/JJK), 2011 WL 4538076, at *4 (D. Minn. Aug. 26, 2011), adopted by, No. 10-609 (MJD/JJK), 2011 WL 4537934 (D. Minn. Sept. 29, 2011). ADQ went one step further in this case by considering Defendants' soft serve mix orders in addition to the previous year's gross sales. ADQ's consideration of Defendants' soft serve mix orders resulted in a significantly lower calculation of fees than had ADQ only considered the previous year's gross sales. See Doc. 31 at ¶ 6. Further, ADQ's calculation of its contractual damages is supported by Pheifer's affidavit and Defendants'

9

monthly sales reports and has been confirmed by this Court's own calculation. ADQ is entitled to recover $41,714.60 in contractual damages from Defendants.

## B. Damages for Unauthorized Use of ADQ's Trademarks in August 2015

Relying on Count II of its complaint alleging that Defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), ADQ contends that it is entitled to an additional $2,560 in damages for Defendants unauthorized use of ADQ's trademarks in August 2015. To prove a trademark infringement claim under § 1125(a), the plaintiff must show that it owns the mark and that the defendant used the mark in connection with goods and services in a manner that created a likelihood of consumer confusion concerning the source or sponsorship of the goods or services. Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1009 (8th Cir. 2011).

ADQ has established that Defendants violated § 1125(a). The Operational Agreement and the Mutual Cancellation were clear: Upon termination Defendants lost any rights to use ADQ's trademarks and were required to de-identify their restaurant from the Dairy Queen® system. Doc. 1 at ¶ 28; Doc. 10-2 at 31; Doc. 10-5 at 3. When ADQ terminated the Mutual Cancellation and Operating Agreement on July 31, 2015, it informed Defendants that they had to immediately cease using ADQ's trademarks. Doc. 10-8. Nevertheless, Defendants continued to use ADQ's trademarks to operate their restaurant throughout the entire month of August 2015. Doc. 1 at ¶ 39. Defendants' operation of their restaurant at the same location they previously operated a properly licensed Dairy Queen® made it highly likely that consumers would be confused about the source or sponsorship of the goods and services Defendants were offering.

A plaintiff who proves a violation of § 1125(a) is entitled "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the

10

costs of the action." 15 U.S.C. § 1117(a). Section 1117(a) is designed to compensate the prevailing party and make trademark infringement unprofitable, not to penalize the defendant. Id.; Rainbow Play Sys., Inc. v. GroundScape Techs., LLC, 364 F. Supp. 2d 1026, 1034 (D. Minn. 2005). Here, Defendants' post-termination use of ADQ's trademarks justifies an award of damages. See 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:58 (4th ed. 2015) ("[I]n situations in which a licensee or franchisee holds over after termination of the license or franchise, damages will readily be awarded to discourage infringement."). ADQ claims that Defendants' actions in August 2015 caused it $2,560 in damages. ADQ arrived at this amount by using Defendants' sales in August 2014 and their soft serve mix order in August 2015 to estimate the licensing and sales promotion fees Defendants would have paid under the Operational Agreement to use ADQ's trademarks for the month of August 2015. The fees Defendants would have owed under the Operational Agreement for using ADQ's trademarks in August 2015 is a reasonable measure of the damages caused by Defendants. See Ramada Inns, Inc. v. Gadsen Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1986) ("Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks." (quotation omitted)).

ADQ contends that it is entitled to treble its $2,560 in damages under § 1117(a). When assessing damages under § 1117(a) "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Id. "Generally, district courts have exercised their authority [pursuant to 15 U.S.C. § 1117] to treble the damages award and increase the profits award to a trebled amount in cases involving intentional, knowing, deliberate, or willful infringement." Djarum v. Dhanraj Imps., Inc., 876 F. Supp. 2d 664, 671 (W.D.N.C. 2012) (alteration in original)

11

(quotation omitted). "An infringer acts 'willfully' if he knows his conduct constitutes infringement." Doctor's Assocs., Inc. v. Subway.SY LLC, 733 F. Supp. 2d 1083, 1088 (D. Minn. 2010).

Defendants, by virtue of their default, admitted ADQ's allegations that their violation of § 1125(a) was willful. See Perfeffi Van Melle USA, Inc. v. Midwest Processing, LLC, No. 15-cv-4093-RAL (D.S.D. Feb. 26, 2016), Doc. 47 at 10 (holding that defendants who defaulted admitted allegations in complaint that they willfully violated § 1125(a)); Chanel, Inc. v. Gordashevsky, 558 F. Supp. 2d 532, 538 (D.N.J. 2008) (finding that defaulting defendant admitted allegations in complaint that he acted willfully for purposes of 15 U.S.C. § 1117(c)(2)); Sigel v. Interplay Entm't Corp., No. 6:06-cv-135-Orl-31DAB, 2007 WL 601613, at *1 (M.D. Fla. Feb. 21, 2007) (concluding that by defaulting, defendant admitted allegations in complaint that its violation of the Lanham Act was willful). Even if Defendants had not made this admission, the July 31 termination letter informing Defendants that any future use of ADQ's trademarks would constitute trademark infringement establishes that Defendants willfully violated § 1125(a). Defendants' conduct in the months leading up to their willful infringement was no better; they ignored their contractual obligations and refused to pay ADQ for using its trademarks. Courts have routinely awarded treble damages under similar circumstances. See La Quinta Corp. v. Heartland Props. LLC, 603 F.3d 327, 341–46 (6th Cir. 2010) (holding that district court did not abuse its discretion by trebling damages against a holdover franchisee who continued using franchisor's trademarks after termination); KFC Corp. v. Lilleoren, 821 F. Supp. 1191, 1193 (W.D. Ky. 1993) (trebling amount of damages defendant owed for continuing to use franchisor's trademarks to operate restaurant after franchisor terminated the franchise agreement).

Trebling ADQ's damages is appropriate here. An award of just $2,560, which amounts to approximately 8% of Defendants' gross sales from August 2015, would allow Defendants to retain a significant amount of the profits they made by infringing on ADQ's trademarks. Further, if the consequence of getting caught for trademark infringement is the amount of fees Defendants would have paid under a franchise agreement, Defendants would have little incentive not to infringe on a party's trademark in the future and simply hope that they avoid detection. An award of treble damages in this case ensures that Defendants' misconduct is unprofitable but is not so excessive as to constitute a penalty. ADQ is entitled to recover $7,680 from Defendants under § 1117 for the August 2015 infringement.

### C. Attorney's Fees and Costs

ADQ contends that it is entitled to attorney's fees and costs in this case under § 1117 and the terms of the Operating Agreement and the Mutual Cancellation. Section 1117(a) provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). A case may qualify as "exceptional" under § 1117(a) when the defendant acted willfully and deliberately. Cmty. of Christ Copyright Corp., 634 F.3d at 1013. In addition to willfulness, courts have considered the defendant's conduct during litigation when determining whether the plaintiff is entitled to attorney's fees under § 1117(a). See Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc., 915 F. Supp. 2d 1179, 1185 (D. Nev. 2013) ("[T]he non-prevailing party's litigation conduct may support a finding that the case is exceptional."); Harris v. Fairweather, No. 11 Civ. 2152(PKC)(AJP), 2012 WL 3956801, at *6 (S.D.N.Y. Sept. 10, 2012) (finding that allegations of willful infringement, "along with defendants' default" were sufficient to justify an award of attorney's fees under § 1117(a)), adopted by, No. 11 Civ. 2152(PKC)(AJP), 2012 WL 5199250 (S.D.N.Y. Oct. 9, 2012).

The facts of this case justify an award of attorney's fees under § 1117(a). Defendants willfully violated the Lanham Act by continuing to use ADQ's trademarks in August 2015 despite the Operating Agreement, the Mutual Cancellation, and the July 31 termination letter making clear that Defendants had absolutely no right to do so. When ADQ sued Defendants they failed to answer the complaint or otherwise participate in the case, which resulted in this Court entering default judgment against them. The evidence here—including Defendants' continued refusal to pay the licensing and sales promotion fees, their decision to ignore ADQ's July 2015 demands to shut down their restaurant, and their infringement of ADQ's trademarks in August 2015—suggests that Defendants intended to exploit ADQ's trademarks for as long as they could without providing ADQ anything in return. Taken as a whole, these circumstances make this an "exceptional" case under § 1117(a).

An award of attorney's fees is also available under the Operating Agreement and the Mutual Cancellation. In South Dakota, a party may agree by contract to pay attorney's fees. Credit Collection Servs., Inc. v. Pesicka, 721 N.W.2d 474, 476–77 (S.D. 2006). The Operational Agreement provides that "[t]he prevailing party in any action or proceeding to enforce the terms and provisions of this Agreement shall be entitled to recover its reasonable attorneys' fees and costs." Doc. 10-2 at 29. Similarly, the Mutual Cancellation states that "[s]hould ADQ institute any action against Licensee to secure or protect ADQ's rights under or enforce the terms of this Cancellation, ADQ shall be entitled to recover in such action its legal and accounting fees, together with court costs and expenses of litigation." Doc. 10-5 at 5. The terms of the Operating Agreement and the Mutual Cancellation thus allow ADQ to recover its attorney's fees and costs for this lawsuit.

The only remaining question is the amount of attorney's fees ADQ may recover. ADQ seeks $63,338.00 in fees, the breakdown of which is as follows:

| Name | Law Firm | Hours | Billable Rate | Fees |
|------|----------|-------|---------------|------|
| Kerry Bundy (partner) | Faegre Baker Daniels | 29.50 | $595/hour | $17,552.50 |
| Jason Stover (associate) | Faegre Baker Daniels | 39.90 | $435/hour | $17,356.50 |
| Nick Rotchadl (associate) | Faegre Baker Daniels | 51.80 | $325/hour | $16,835.00 |
| Margaret Flesher (paralegal) | Faegre Baker Daniels | 19.1 | $295/hour | $5,634.50 |
| Meredith Moore (local counsel) | Cutler Law Firm | 28.75 | $210/hour | $5,959.50[2] |
| Total | | | | $63,338.00 |

Docs. 38, 39, 43, 44.

Bundy, Stover, and Rotchadl are attorneys while Flesher is a paralegal. Moore works at a firm in Sioux Falls, South Dakota, and is local counsel in this case. Although Bundy's hourly rate is certainly high, it is justified. The affidavit ADQ filed in support of its request for fees establishes that Bundy is a highly skilled attorney with a significant amount of experience and expertise in franchise and distribution litigation. Docs. 39, 39-1. Bundy's performance at the hearings in this case lent further proof to her proficiency as an attorney.

The evidence ADQ submitted in support of the hourly rates for Stover, Rotchadl, and Flesher is less compelling. The only information ADQ provided about Stover and Rotchadl is

---

[2]There is a possible error in this number as 28.75 x $210 actually equals $6,037.50. In Moore's first affidavit setting forth her fees, she states: "To date, I have expended twenty-four (24) hours in this matter, resulting in attorney's fees of $4,962.00." Doc. 38. In her supplemental affidavit, she states: "In preparation for and attendance at the November 24, 2015 hearing on damages, I expended an additional 4.75 hours of time, resulting in attorney's fees of $997.50." Doc. 43. To arrive at the $5,959.50 figure listed above, the $4,962.00 is added to the $997.50. It is possible that Moore's hourly rate changed during the pendency of this case.

that Stover was "Counsel" at Faegre Baker Daniels and had ten years of experience in franchise litigation while Rotchadl is an associate at Faegre Baker Daniels with less than three years of franchise litigation experience. As to Flesher, ADQ simply states that she is "a senior paralegal who assists legal teams in managing litigation." Doc. 39 at 1. This limited information does not justify the high hourly rates charged for Stover, Rotchadl, and Flesher. To be more in keeping with local rates, this Court reduces Flesher's hourly rate to $150 and the hourly rates of Stover and Rotchadl to $210. See Kirschenman v. Auto-Owners Ins., No. CIV 09-4190-KES, 2012 WL 1493833, at *3 (D.S.D. Apr. 27, 2012) (concluding that $250 an hour was a reasonable rate for experienced attorneys in South Dakota); Albers v. Tri-State Implement, Inc., No. CR. 06-4242-KES, 2010 WL 960010, at *24 (D.S.D. Mar. 12, 2010) (finding that $65 dollars an hour is an appropriate rate for a paralegal and that $150 an hour was an appropriate rate for an associate with a one-year clerkship and three years of litigation experience); Howard Johnson Int'l, Inc. v. Inn Dev., Inc., No. CIV. 07-1024-KES, 2008 WL 2563463, at *2 (D.S.D. June 23, 2008) ("Experienced, partner-level trial counsel in this community have received awards of attorney's fees ranging from $200.00 per hour to $225.00 per hour in law suits requiring highly specialized knowledge."); City of Livonia Emps. Ret. Sys. v. Hanson, No. CIV 05-4178, 2008 WL 608319, at *3 (D.S.D. Mar. 4, 2008) (concluding that hourly rate for paralegals of $240 dollars was excessive and reducing rate to $125). After this adjustment, ADQ's attorney's fees are $45,634.

ADQ submitted affidavits establishing that its costs in this case were $2,425.14. Docs. 38, 38-1, 39.

**III.    Conclusion**

For the reasons stated above, it is hereby

ORDERED that Defendants pay ADQ $49,394.60 in damages. This sum is the total of ADQ's contractual and Lanham Act damages. It is further

ORDERED that Defendants pay ADQ an additional $48,059.14 in attorney's fees and costs. It is finally

ORDERED that ADQ submit a calculation of the prejudgment interest it is seeking, if any, within 21 days of this order, and Defendants then shall have 14 days thereafter to respond, if they wish.

DATED this _1st_ day of March, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE